**Donald J. DEVINE, Petitioner,**

v.

**Allison E. NUTT, et al., Respondents.**

**Appeal No. 83–589.**

United States Court of Appeals, Federal Circuit.

Sept. 22, 1983.

---

George M. Beasley, III, Washington, D.C., argued for petitioner.

Charles A. Hobbie, Washington, D.C., argued for respondents.

Allison E. Nutt, respondent, pro se.

Before DAVIS, NICHOLS, BALDWIN, KASHIWA and MILLER, Circuit Judges.

DAVIS, Circuit Judge.

Donald J. Devine, Director of the Office of Personnel Management, brings this petition for review of an arbitration award, issued by respondent Nutt, pursuant to 5 U.S.C. § 7703(d) (1982).[1] Petitioner also named the American Federation of Government Employees (the union) and the Government Services Administration (the employing agency) as respondents. Director Devine urges us to reverse the arbitrator's award, which mitigated the employing agency's removal of grievants-employees Wilson and Rogers to two-week suspensions without pay. The union, in turn, urges that we deny the petition for review, on the ground that it was untimely filed, and, in any event, because we have discretion to decline the appeal. On the merits, the union urges us to uphold the award.

As the following discussion shows, we find petitioner's submission to be timely filed and we exercise our discretion to grant petitioner's request for review. We affirm the arbitrator's award as to Wilson, but modify his award with respect to Rogers.

I

The facts do not provide an example of model conduct by government employees. Grievants Wilson and Rogers were employed by the Government Services Administration as Federal Protective Service (FPS) officers in the Denver, Colorado area. On January 7, 1982, Rogers, while on patrol in an official government vehicle, drove to his residence in a nearby suburb and picked up several cans of beer at his supervisor's request; he then returned to the FPS command center and delivered the beer to his supervisor. The supervisor consumed the beer and then left the empty cans at the command post when he went off duty. Alarmed at the prospect of discovery, the supervisor later telephoned Wilson, who was then on duty at the command post, instructing Wilson to alter the monitor tapes of telephone conversations between the command post and patrolling FPS officers to include a spurious explanation for the presence of the empty cans in the command post. Wilson complied with the supervisor's request.

Subsequently, an FPS official, who was monitoring the tapes for other purposes, discovered irregularities in the tapes which led her to believe that Wilson and the supervisor had attempted to edit them in an attempt to conceal the consumption of the beer at the command post. Special agents of the GSA commenced an investigation of the incident. Two such agents confronted Rogers at his home and requested him to

---

**1.** 5 U.S.C. § 7703(d) (1982) provides:

(d) The Director of the Office of Personnel Management [OPM] may obtain review of any final order or decision of the [Merit Systems Protection] Board by filing a petition for judicial review in the United States Court of Appeals for the Federal Circuit if the Director determines, in his discretion, that the Board erred in interpreting a civil service law, rule, or regulation affecting personnel management and that the Board's decision will have a substantial impact on a civil service, law, rule, regulation, or policy directive. If the Director did not

intervene in a matter before the Board, the Director may not petition for review of a Board decision under this section unless the Director first petitions the Board for a reconsideration of its decision, and such petition is denied. In addition to the named respondent, the Board and all other parties to the proceedings before the Board shall have the right to appear in the proceeding before the Court of Appeals. The granting of the petition for judicial review shall be at the discretion of the Court of Appeals.

This statute is made applicable to adverse action arbitrations by 5 U.S.C. § 7121(f) (1982).

accompany them to a local police station for a "non-custodial" interrogation concerning the irregularities. The agents took notes throughout the interview. At no time was Rogers informed that he was entitled to have a union representative present at the interview.[2] The same special agents later interviewed Wilson in a similar fashion; they did not advise Wilson of his right to representation at the investigatory interview. Approximately one month after these sessions, the special agents met separately with each of the grievants and asked them to sign affidavits composed from the agents' notes taken in the previous interviews. The grievants complied with the agents' request; during these later interviews, they once again were not alerted to their right to union representation as specified in the collective bargaining agreement.

On April 2, nearly three months after the alleged incidents of wrongdoing, both grievants received proposed notices of removal from their positions. After receiving written responses to the charges, the employing agency issued a removal notice to Wilson for falsification of tape recordings and attempting to conceal activities of record. Rogers received a removal notice for falsification of records, failure to report irregularities, and use of a government vehicle for non-official purposes.

Both grievants requested arbitration of their removals, as they were entitled to do under their union's collective bargaining contract. The arbitrator (respondent Nutt) found that the grievants committed the alleged acts of wrongdoing.[3] He concluded, however, that the grievants "were not given an opportunity to have a [union] representative present" as required by the collective bargaining agreement, though he also determined that the grievants were not "unaware of their right to representation during an investigatory interview." The arbitrator also agreed with the union's contention that the agency violated Article XXVII, Section 3[4] of a supplement to the collective bargaining agreement by permitting an unreasonable period of time to elapse between the issuance of the proposed notices of removal and the date when the agency first learned of the offense.[5] The arbitrator declared, on the other hand, that the union did not claim or demonstrate any prejudice *to the grievants* due to the failure to have union representation or to the "inordinate delay" in the issuance of the notices of proposed removal. But the arbitrator concluded that "[s]olely because of the agency's pervasive failure to comply with the due process requirements of the agreement,"[6] the grievants' removal was not for

**2.** Article XXVII, Section 2 of the collective bargaining agreement between GSA and the grievants' union, the American Federation of Government Employees, provides:

The Employer agrees that during formal discussion where interrogation or written or sworn statements are taken from an employee, in connection with a charge that may result in disciplinary action against him, he will have the opportunity to have a representative present. It should be understood that counseling sessions are not formal discussions.

**3.** The union did not contest the facts upon which the arbitrator based this finding.

**4.** That contract section provides, in pertinent part:

PROPOSED NOTICE: In the event an employee is issued a notice of proposed disciplinary or adverse action, that employee must be afforded and made aware of all his/her rights.

These proposed notices shall be served on the employee(s) within a reasonable period of time (normally 40 calendar days) after the occurrence of the alleged offense or when the alleged offense becomes known to management.

**5.** The arbitrator apparently miscalculated the period of time which elapsed between when the agency first became aware of the offense (February 2) and the date when the proposed notices of removal were issued to grievants (April 2). The arbitrator erroneously stated that the notices were issued on May 3; on that day, grievants actually submitted their formal written responses to the April 2 proposed notices.

**6.** The arbitrator likewise found that the agency early (February 4, 1982) instructed employees who were being interviewed in the general investigation not to discuss those interviews with any other persons. The union charged this was a "gag" rule. The arbitrator did not find that this so-called "gag" rule prejudiced Rogers or Wilson.

just cause. The award reduced the removals to two-week suspensions without pay.

The arbitrator issued his award on July 16 and subsequently issued a revised award on July 31.[7] Petitioner received the notice of award on August 12 and filed a request for reconsideration of the award with the arbitrator on September 13, pursuant to his understanding of 5 U.S.C. § 7703(d) (1982). *See supra* note 1. On October 13, the arbitrator denied reconsideration in a terse statement which petitioner received on October 15. Then, on November 14, petitioner filed his request to this court for judicial review of the arbitrator's award.

## II

At the outset, the union argues that petitioner failed to file his request for reconsideration of the arbitrator's award and his petition for review in this court in a timely fashion. In an earlier order, another panel of this court held that the petition for review in this case was timely filed because Director Devine was entitled to seek reconsideration by the arbitrator. *Devine v. Nutt,* No. 83–589 (Fed.Cir. Apr. 12, 1983) (order).[8] We now find the union's remaining contention on timeliness—relating to the timeliness of petitioner's request for reconsideration—to be meritless.

■ The Director received the arbitrator's revised award on August 12, 1982. We have previously decided that the time for filing a request for reconsideration "runs from the date the Director receives notice of the decision of the . . . arbitrator . . . ." *Devine v. Sutermeister,* No. 83–813 (Fed. Cir. June 2, 1983) (order). Petitioner's request for reconsideration by the arbitrator was filed on Monday, September 13, 1982. A cursory reading of the rule governing computation of time reveals that the peti-

tion was timely filed—the weekend preceding petitioner's filing could not be included in the 30-day required period. *See* Fed.R. App.P. 26(a). We therefore hold that petitioner's request for reconsideration of the arbitrator's award was timely.

## III

■ We must also decide whether this court should exercise its discretion to review the arbitrator's award. *See* 5 U.S.C. § 7703(d) (1982), *supra* note 1. The statute authorizes the Director of OPM to request judicial review of an arbitrator's decision if he believes that the arbitrator erroneously interpreted civil service statutes or regulations—with the result that the decision "will have a substantial impact" on civil service law. *See id.; Devine v. White,* 697 F.2d 421, 434 (D.C.Cir.1983). Of course, petitioner's assessment of substantial impact is not binding on this court. In determining whether we should exercise our discretion, we must balance the desirability of review against the traditional labor policy of judicial deference to arbitrators' decisions. *See United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960); *United Steelworkers v. American Manufacturing Co.,* 363 U.S. 564, 569, 80 S.Ct. 1343, 1347, 4 L.Ed.2d 1403 (1960); *White, supra,* 697 F.2d at 434–36.

■ We find it appropriate to exercise our discretion to consider the merits of the petition in this case. This conclusion is buttressed by the District of Columbia Circuit's recent decision in *White, supra.* Here, as there, the controversy between the parties does not proceed primarily from the arbitrator's factfinding or his evaluation of the language contained in the collective bargaining agreement. Rather, the key is-

---

7. The revised award simply clarified grievants' suspension; they were to be suspended for two weeks without pay, rather than a period of "not less than two weeks without pay," as the original award provided.

8. In that order, this court put its holding upon the grounds that the OPM was not a party before the arbitrator, that OPM's position on

the issues raised in the appeal may differ from those of either party to the arbitration, and that meaningful appellate review of the arbitrator's decision on the basis of the OPM objections is hardly possible unless the arbitrator knows of the OPM objections and has a chance to modify his decision to conform to them, or to state his reasons for not doing so.

sue in this case, as in *White,* is the applicability of the "harmful error" standard contained in 5 U.S.C. § 7701(c)(2)(A) (1982) [9] in adverse action proceedings that are brought to arbitration pursuant to 5 U.S.C. § 7121(e) (1982). That issue is one of first impression in this court; its resolution indisputably will have a substantial impact upon civil service law. Employees who wish to appeal an agency's decision to discipline or remove them from service may choose arbitration, rather than an appearance before the Merit Systems Protection Board, depending upon the applicability of the "harmful error" standard in arbitration proceedings. *Cf. White, supra,* 697 F.2d at 440–41.

We should also exercise jurisdiction here in order to settle a related issue of substantial importance to civil service law—the proper place of external (*e.g.,* statutory) law in adverse action arbitration. *See id.,* 697 F.2d at 438. Judicial deference to an arbitral award may be inappropriate when the award is in apparent conflict with a federal statute that is distinct from the operation of the collective bargaining agreement. In the present case, Arbitrator Nutt mitigated the agency's removal of grievant Rogers for unauthorized use of a government vehicle in a fashion apparently inconsistent with the command of the statute governing such offenses.[10]

In exercising our jurisdiction over this petition, we are mindful of the traditional federal policy favoring arbitration of labor disputes, *see Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 458–59, 77 S.Ct. 912, 918–919, 1 L.Ed.2d 972 (1957), and the

solicitude that the federal courts have generally accorded to arbitral awards over the years. *See United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1352–1353, 4 L.Ed.2d 1409 (1960). Yet we cannot accept the union's invitation to abdicate our responsibility to review those awards that may conflict with statutory authority. If we were to decline review solely because arbitral awards are said to have little precedential value, we would be in effect foreclosing all judicial review of adverse action arbitration. That result would contradict the Congressional mandate, contained in § 7703(d), authorizing us to review awards that have a substantial impact upon civil service law. Accordingly, we grant the petition for review and exercise our jurisdiction here.

## IV

We turn to the question of whether and to what extent the "harmful error" standard—required by statute to be applied in MSPB review of agency adverse actions, *see* 5 U.S.C. § 7701(c)(2)(A) (1982) [11] —must be employed in adverse action arbitration. *See supra* note 9. Our holdings are that (1) arbitrators should take account of "harmful error" in deciding whether a grievant was personally prejudiced, but (2) there can be violations of the collective bargaining agreement, not prejudicial to the particular grievant, that the union may raise on its own behalf in the grievance proceeding and which are to be taken into account in making the ultimate award, and (3) in this case there were such violations which the arbi-

9. In essence, the "harmful error" standard recognizes that an agency's adverse action against an employee cannot be sustained by the Merit Systems Protection Board (MSPB) if the employee can demonstrate (1) that the agency violated proper procedures in its decision to discipline or remove the employee and (2) that the procedural error substantially impaired the rights of the employee. *See* 5 U.S.C. § 7701(c) (1982); *cf. Shaw v. United States Postal Service,* 697 F.2d 1078, 1080 (Fed.Cir.1983). *See infra* Part IV.

10. 31 U.S.C. § 1349(b) (1982) provides, in relevant part, that:

> An officer or employee who willfully uses or authorizes the use of a passenger motor vehicle or aircraft owned or leased by the United States Government ... shall be suspended without pay by the head of the agency. The officer or employee shall be suspended for at least one month, and when circumstances warrant, for a longer period or summarily removed from office.

11. That provision states that the MSPB shall not sustain an agency's decision if the affected employee "shows harmful error in the application of the agency's procedures in arriving at such decision."

trator properly took into account (except as discussed in Part V, *infra*) even though those violations were not personally prejudicial to grievants Rogers and Wilson.

### A.

Congress has decreed that the MSPB must uphold agency adverse actions taken to promote the efficiency of the service if they are supported by a "preponderance of the evidence." *See* 5 U.S.C. § 7701(c)(1)(B) (1982). Statutory authority explicitly requires arbitrators to sustain such agency adverse actions if they are supported by a preponderance of the evidence. *Id.* § 7121(e)(2) (1982). The Civil Service Reform Act does not make it as clear whether (and, if so, in what form) the arbitrator must utilize the "harmful error" test of § 7701(c)(2). We agree, though, with the court in *Devine v. White,* 697 F.2d 421, 441 (D.C.Cir.1983), that "harmful error" applies in determining whether the particular grievant has been prejudiced (even though we also think, as discussed below, that an arbitral award can nevertheless be based on collective bargaining violations important to the union but not prejudicial to the individual grievant).

The legislative history of the Civil Service Reform Act relating to arbitration of adverse action decisions states that "the arbitrator must follow the same rules governing burden of proof and standard of proof that govern adverse actions before the Board." H.R.Rep. No. 1717, 95th Cong., 2d Sess. 157, *reprinted in* 1978 U.S.Code Cong. & Ad.News 2763, 2860, 2891. Congress also wanted "to promote consistency ... and to avoid forum shopping." H.R.Rep. No. 1717, *supra,* at 157, 1978 U.S.Code Cong. & Ad. News 2891. Because the "harmful error" provision can appropriately be regarded as part of the "standard of proof" (if not of the burden of proof itself) with respect to the individual grievant, it is proper to hold the arbitrator to that rule insofar as he

decides the particular instance of the individual grievant.[12]

But like the *White* court, *supra,* 697 F.2d at 443, *see id.* at 446 (Bork, J., concurring), we also hold that the arbitrator can take account of significant violations of the collective bargaining agreement, important to the union, even though the particular grievants may not have been themselves adversely affected. The union is a major (if not *the* major) party to the arbitration and its proper interests are to be protected, even though the interests of the particular grievants may not, alone, call for protection. Congress so recognized the role of unions and collective bargaining agreements. The Reform Act expressly provides that management prerogatives shall not "preclude any agency and any labor organization from negotiating ... procedures which management officials of the agency will observe in exercising [their] authority" to discipline and remove employees. 5 U.S.C. § 7106(b) (1982). In the contract here, the union and the agency agreed to institute procedures that provide employees with union representation at investigatory interviews and timely notice of proposed adverse action within a reasonable period after the offense or its discovery. These procedural safeguards, established by collective agreement, effectively become union rights. In the Reform Act, Congress also expressly provided that, in adverse action cases of this type, a "collective bargaining agreement shall provide procedures for the settlement of grievances, including questions of arbitrability" (5 U.S.C. § 7121(a)(1) (1982)), and recognized that, in matters of this kind raised under the negotiated grievance procedure, the union should be the representative and there should be binding arbitration (if necessary). 5 U.S.C. § 7121(b)(2)(B) (1982). We think this statutory scheme means that important *union* rights are also to be enforced in the negotiated grievance procedure.

---

12. Though § 7121(e)(2) of the Reform Act (Title 5, U.S.Code), *supra,* specifically incorporates only § 7701(c)(1), *supra,* the latter is made "Subject to paragraph 2 of this subsec-tion" (*i.e.,* § 7701(c)(2), the "harmful error" provision) and can therefore be read, in view of the legislative history, as likewise incorporating § 7701(c)(2).

In short, we recognize that adverse action arbitrations "are statutorily required to be similar to MSPB hearings in some respects but in other respects may be different." *See Otherson v. INS,* 711 F.2d 267 at 273 (D.C.Cir.1983).

**B.**

■ Applying these principles to grievant Wilson, we hold that the arbitrator's award of a two-week suspension without pay is entitled to finality and should be affirmed. The award draws its essence from the collective bargaining agreement, *see United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960), and is not in conflict with civil service statutory or regulatory authority. *See White, supra,* 697 F.2d at 440.

The arbitrator concluded that the agency violated at least two provisions of the collective bargaining agreement in its investigation of Wilson's misconduct. First, he found that "the Agency did not give the Grievants an opportunity to have a [union] representative present during the investigation" as required by the agreement. Jt. App. 29; *see supra* note 2. Second, the arbitrator determined that the agency violated another contract provision by failing to give timely notice of its proposed decision to remove grievants. Jt.App. 31; *see supra* note 4. In the arbitrator's opinion, this "pervasive failure to comply with the due process requirements of the agreement" justified mitigation, though he also found Wilson and Rogers not to have been personally prejudiced.

As we have said, the arbitrator's award, in this respect, did not controvert any civil service law or regulation. In addition, the presence in the contract of these procedural safeguards concerning representation and notice is evidence of their substantiality and importance to the union and its members covered by the agreement. *See White, supra,* 697 F.2d at 443. They also appear, of themselves, to be significant measures for the union and its members. Viewed in this light, the arbitrator's decision to uphold and enforce the vitality of these provisions by, in effect, penalizing the agency for disregarding them was reasonable and within the scope of his authority. *See Enterprise Wheel & Car Corp., supra,* 363 U.S. at 597, 80 S.Ct. at 1361. Violations of explicit and important procedural rights contained in a contract, such as these, could fairly be said to be tantamount to "harmful error" to the union within the scope of 5 U.S.C. § 7701(c)(2)(A) (1982) for the purposes of collective bargaining arbitration in which the union is a proper party. *See White, supra,* 697 F.2d at 443; *id.* at 446 (Bork, J., concurring). For that reason, we cannot disturb the award as to Wilson.

**V**

We cannot, however, sustain that portion of the arbitrator's award which reduced grievant Rogers' removal to a two-week suspension; there was an error of law in mitigating that penalty. *See Devine v. White,* 697 F.2d 421, 440 (D.C.Cir.1983).

■ Although the arbitrator is free to make an award consonant with the scope of the collective bargaining agreement, *see United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960), he must not issue awards that conflict with "external law" such as federal statutes and regulations. *See White, supra,* 697 F.2d at 438. In requiring Rogers to serve a two-week suspension for unauthorized use of a patrol vehicle, the arbitrator disregarded the explicit mandatory requirement of 31 U.S.C. § 1349(b)(1982), *see supra* note 10. That section commands that "[a]n . . . employee who willfully uses" a government vehicle for unauthorized purposes "*shall* be suspended *for at least one month*. . . ." (emphasis added). The Court of Claims, whose precedents are binding upon us,[13] has previously interpreted this statute to require, at a minimum, a one-month suspension for its violation. *Clark v. United States,* 162 Ct.Cl. 477, 486–87 (1963).

The union contends that some question exists as to whether Rogers actually com-

**13.** *South Corp. v. United States,* 690 F.2d 1368, 1371 (Fed.Cir.1982).

**1056**

mitted an infraction of § 1349(b), because the arbitrator made no finding as to whether Rogers' use of the vehicle was authorized. That contention is groundless. Many "authorized purposes" may exist for use of a government vehicle, but they do not include frolics and detours—even at the behest of a supervisor—in order to procure alcoholic beverages for on-duty consumption. Government employees must know at least that much.

We hold, then, that the arbitrator erred as a matter of law in mitigating grievant Rogers' removal to a two-week suspension.[14] Mindful of the prophylactic nature of mitigation in this case, *see supra* Part IV, we modify the arbitrator's award, with respect to Rogers, to a one-month suspension without pay, in accordance with § 1349(b).

### VI

We affirm 'the arbitrator's award as to grievant Wilson in all aspects. Grievant Rogers' award is modified to the extent that he should serve a full one-month suspension without pay in accordance with the terms of 31 U.S.C. § 1349(b) (1982).

*Affirmed as modified.*

---

14. In this respect we apparently disagree with *White, supra,* 697 F.2d at 427 n. 11, if that holding was meant to apply to the minimum statutory penalty.